UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | CAUSE NO. 3:15-cr-48 JD |
| VINCENT JONES, | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

On September 14, 2015, the Defendant Vincent Jones (Jones) filed a Motion to Suppress [Doc. No. 12], which on September 15, 2015, was referred to the undersigned to conduct a hearing and prepare a Report and Recommendation. On October 2, 2015, the Court held a status conference and set an evidentiary hearing for October 19, 2015. On October 19, 2015, six witnesses testified at the suppression hearing. Both Jones and the United States filed supplemental post hearing briefs and on November 30, 2015, Jones' Motion to Suppress was fully ripe. The undersigned now issues the following Report and Recommendation and for the reasons that follow, **RECOMMENDS** that Jones' Motion to Suppress [Doc. No. 12] be **DENIED**.

**I. SUMMARY OF FACTS**

The testimony of the six witnesses establish the following:

On June 5, 2013, Deputy Marshal Jason Yagelski of the Westville Police Department was dispatched to 27 New Durham Estates, Westville, Indiana, in reference to a possible sexual assault that had occurred at this residence. Upon arrival on the scene, Deputy Yagelski learned

1

that Jennifer Kelley's daughter, may have been molested by Jones.

In order to question Jennifer Kelley and her daughter, Deputy Yagelski took them to the Westville Police Department where they gave a statement to Marshal Jim Gunning and Deputy Yagelski. The younger Kelley informed the officers that she had been sexual assaulted by Jones. Jennifer Kelley informed the officers that she resided at 27 New Durham Estates with Jones. Kelley also told the officers she was afraid of Jones, that he was a convicted felon, that he had guns in a safe in their bedroom and that she was in fear for her life and the lives of her children.

After questioning the Kelleys, Marshal Gunning, Deputy Yagelski, Captain James Jackson, Sgt. Brian Piergalski and Deputy Corey Chavez from the Laporte County Sheriff's office returned to 27 New Durham Estates to remove Jones and to search it. Upon arrival, the officers were greeted by Jones who opened the door. Marshal Gunning informed Jones that he needed to vacate the premises. Marshal Gunning saw knives laying on the kitchen counter. He asked Jones if there were any drugs or weapons in the residence and Jones replied "no just those knives over there." The officers then allowed Jones to retrieve some of his personal belongings and he was escorted outside where he was handcuffed for officers' safety.

Officer Piergalski then asked Jennifer Kelley to sign a Consent to Search Form for her mobile home at 27 New Durham Estates. [Exhibit #3]. Kelly agreed and signed the consent form. The Consent to Search Form permitted a warrantless search of her "...trailer residence and all rooms including enclosed boxes, safes etc. to clear the home of possible weapons and/or drugs." Jones was not asked for his consent to search the trailer or the safe, nor was he shown the Consent to Search Form that Kelley had signed.

Once inside the trailer, Sgt. Piergalski saw two gun safes, a small one on top of a larger

one, in the bedroom shared by Jennifer and Jones. Piergalski also saw ammunition and empty gun holsters. Piergalski testified that the smaller safe was partially open, and he could see several guns in the open safe. He then opened the door further to better see the hand guns.

Upon seeing the contents of the open safe and in consultation with a deputy prosecuting attorney, the initial search was stopped in order to obtain a search warrant. A search warrant was issued by the LaPorte County Superior Court to search the mobile home at 27 New Durham Estates and the contents of the locked safe.

## II.   ANALYSIS

Jones argues that because he was not asked and did not give his consent to the search of the bedroom he shared with Kelley, the search was illegal and the fire arms seen and seized must be suppressed. He further argues that the Consent to Search executed by Ms. Kelley was not applicable or effective against him citing, *Georgia* v. *Randolph*, 547 U.S. 103 (2006). He also argues that the subsequent search warrant was tainted by what officers impermissibly saw while in his bedroom.

The Fourth Amendment of the Constitution provides in part: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, . . . ." Were the analysis simply a question of whether the search in this case was reasonable, the Court's work would be quickly done, as there is nothing to suggest otherwise. The evidence clearly shows that at each critical step the officers proceeded cautiously, carefully and appropriately. Upon receiving a call of a potential sexual assault, they responded to the scene and then interviewed both the alleged victim and her mother at the police station. Learning from the mother that her boyfriend may have sexually assaulted her daughter,

that her boyfriend lives with her, was a felon, had guns, and that she feared him, the officers returned to the mother's residence. Upon arrival at the residence, the officers found the mother's boyfriend, allowed him to remove personal items, removed him from the residence and with the mother's written consent began to search her residence. Once inside the officers found knives, ammunition, empty holsters and an open safe which held the guns the mother had warned the officers about. Upon this discovery, and in consultation with the local prosecuting attorney, the officers stopped their initial search and obtained a search warrant.

In summary, upon the report of a sexual assault, the officers investigated, assessed, and interviewed the victim and her mother. They learned of the nature of Jones who was a felon, armed and perhaps dangerous, and they sought and obtained the consent of the mother to search her home. Upon seeing guns in an open safe they then stopped their search to obtain a search warrant, a legally unnecessary act but certainly reasonable under the circumstances.

One would think that these facts show that the officers had conducted a "reasonable" search as the Constitution requires and that would be the end of the analysis. But controlling legal principles requires more before the Court can conclusively conclude that Constitutional standards have been met.

While the Fourth Amendment requires a search warrant in some cases, it does not so require in all cases. Obviously if a valid consent to search is given, for instance, a search warrant is simply unnecessary. *Schneckloth* v. *Bustamonte*, 412 U.S. 218 (1973). Valid consent must be voluntary and the prosecutor carries the burden of proof to show from the totality of the circumstances that the consent was voluntary. *U.S.* v. *Mendenhall*, 446 U.S. 544, 557 (1980). The Supreme Court notes that consent searches are recognized as "standard investigative

techniques of law enforcement agencies" and are "constitutionally permissible and wholly legitimate aspect of effective police activity." *Id.* at 228.

There is no question that Ms. Kelly gave consent to the police officers to search her home. In fact, she gave consent twice, both orally and in writing. Nor is there any question whether that consent was voluntary. The only question is whether her consent was valid against Jones her boyfriend and co-occupant. Jones argues that it was not because he was not asked and he did not consent. He cites *Georgia* v. *Randolph*, 547 U.S. 103 (2006) for support. His support is misplaced.

In *Randolph*, the Supreme Court held that a warrantless search of a shared residence is unreasonable and invalid against one co-occupant who is present and objects even if another co-occupant is present and gives consent to search. In short, where two occupy the residence and are present and one consents to the search while the other objects, the tie goes to the objecting occupant and a search warrant is required. *Id.* at 106. Objecting to the search is critical.

The Seventh Circuit refined *Randolph* in *U.S.* v. *Henderson*, 536 F.3d 776 (2008). In facts similar to the present case, Chicago police officers responded to a report of domestic abuse. At the scene officers found a woman standing with a neighbor outside her home. The woman told the officers that her husband choked her and threw her out of the house. The woman also had bruise marks around her neck. The woman also told the officers that her husband had weapons in the house, and he had drug and gun arrests. She also told officers she wanted him arrested. The police were given a key to the house and entered it and found the husband. He objected to the police and told them to leave. Police arrested him instead, removed him from the house and took him to the police station. The wife then agreed to a search of the house where

5

police officers found guns and drugs.

The husband moved to suppress the guns and drugs arguing that his objection to the search invalidated his wife's consent and therefore following *Randolph,* the search violated his Fourth Amendment Rights. The Seventh Circuit disagreed.

The Seventh Circuit noted that *Randolph* is limited to the case where both co-occupants are present and one occupant consents while the other objects. "Both presence <u>and</u> objection by the tenant are required to render a consent search unreasonable to him." *Henderson*, 536 F.3d at 785. (emphasis in original.) The Seventh Circuit cited another Supreme Court case, *U.S.* v. *Matlock*, 415 U.S. 164 (1974), which was not disturbed or overruled by *Randolph*.

> In *Matlock,* the defendant was arrested in the front yard of the house where he lived with his girlfriend, Gayle, and her family members. He was placed in a nearby squad car and was not asked for his consent to a search of the bedroom he shared with Gayle. She, however, agreed to the search, which turned up evidence of Matlock's involvement in a bank robbery. Noting that a tenant of shared premises assumes the risk that cotenants may allow common areas to be searched by the police, the Court held: "[T]he consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared."

*Id.* at 780 (quoting *Matlock*, 415 U.S. at 170).

The Seventh Circuit noted that another Supreme Court case, *Illinois* v. *Rodriguez*, 497 U.S. 177 (1990), reached a similar conclusion. "The defendant in *Rodriguez* was present but asleep in the next room when his co-occupant gave police consent to search." *Id.* (quoting *Rodriguez*, 497 U.S. at 180). To restate, to obtain the benefit of *Randolph* as both the Supreme Court and Seventh Circuit have ruled, the defendant must both be present and object to invalidate a co-occupant's consent.

In this case, there is no evidence whatsoever that Jones had any objection to the consent his girlfriend, Kelley, gave to police officers to search her residence. As the Supreme Court

6

noted in *Matlock*, Jones assumed the risk that a co-occupant, Kelley, may allow common areas, a shared bedroom, to be searched by police. If he wished the benefit that *Randolph* provides, he must have objected. He did not. His passive silence can not be reasonably inferred to be an objection to the search. If anything, his silence is presumed to be his assent to the search and the consent his co-occupant gave. How could the police officers reasonably presume otherwise?

Jones argues that while he did not object, he was not asked for consent. This argument assumes there is a legal obligation of police officers to obtain consent from all occupants of a residence. There simply is no such legal authority for that proposition and such a proposition would directly contradict *Matlock, Rodriguez*, and *Henderson*. Note that in *Matlock,* the defendant though present, was not asked for his consent. Similarly in *Rodriguez*, the defendant was present and also was not asked because he was asleep.

Therefore, because Kelley voluntarily gave police officers consent to search the residence she shared with Jones and Jones did not object, though present, the consent to search was valid. Jones' now belated objection is insufficient to invalidate his co-occupant's consent as established in *Henderson*, *Matlock*, and *Rodriguez.* As *Henderson* makes clear, *Randolph* is not controlling or applicable to this case because Jones failed to object to the search when it occurred.

Having found Kelley's consent valid, the officer's entry and initial search was appropriate. After the officer saw guns in the open safe, the warrantless search stopped, a warrant was obtained and the search was resumed. Jones' argument that the subsequent search warrant was tainted by the warrantless search fails simply because there is nothing that "taints"

7

the search warrant. Everything prior to obtaining the warrant was legal and proper comporting with all the requirements of the Fourth Amendment, especially as defined by *Schneckloth*, *Matlock*, *Rodriquez*, and *Henderson.* As a result, the undersigned now **RECOMMENDS** that Jones' Motion to Suppress [Doc. No. 12] should be **DENIED**.

**NOTICE IS HEREBY GIVEN that within fourteen (14) days after being served with a copy of this recommended disposition a party may serve and file specific, written objections to the proposed findings and/or recommendations. Fed. R. Civ. P. 72(b)(2). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.**

**SO ORDERED.**

Dated this 16th day of December 2015.

                                                         s/Christopher A. Nuechterlein
                                                       Christopher A. Nuechterlein
                                                       United States Magistrate Judge