UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| UNITED STATES OF AMERICA | ) | |
| --- | --- | --- |
| | ) | |
| v. | ) | Case No. 3:15-CR-048 JD |
| | ) | |
| VINCENT JONES | ) | |

**OPINION AND ORDER**

This matter is before the Court on the defendant Vincent Jones' motion to suppress. Mr. Jones is facing a one-count indictment for possessing firearms as a felon, and argues in his motion that the firearms and ammunition discovered during a search of his home should be suppressed. The Court referred the motion to Magistrate Judge Christopher A. Nuechterlein, who held an evidentiary hearing and issued a Report and Recommendation, recommending that the motion be denied. Mr. Jones filed objections to that Report and Recommendation, and those objections have now been fully briefed. For the following reasons, the Court adopts the Report and Recommendation and denies the motion to suppress.

**I. FACTS**

On June 5, 2013, Marshal James Gunning and Deputy Marshal Jason Yagelski of the Westville Police Department were dispatched to 27 New Durham Estates, Westville, Indiana, in reference to a reported sexual assault at that residence. Upon arriving on the scene, they encountered Jennifer Kelley and Ms. Kelly's daughter, who had called to report the incident. Ms. Kelley expressed that she was afraid, so the officers offered to bring them to the police department. Once there, Ms. Kelley's daughter informed the officers that she had been sexually assaulted by Mr. Jones, her mother's boyfriend who lived with them in the home. Ms. Kelley also told the officers she was afraid of Jones, that he was a convicted felon who had tendencies of being violent and aggressive, that he had guns in their bedroom, and that she was in fear for

her life and the lives of her children. Officers then ran a criminal history check on Mr. Jones and confirmed that he had prior felony convictions.

After questioning the Kelleys at the police station, Marshal Gunning and Deputy Yagelski were joined by three officers from the LaPorte County Sheriff's Department—Captain James Jackson, Sergeant Brian Piergalski and Deputy Corey Chavez—to return to the residence to remove Mr. Jones and to search it. Upon arrival, the officers were greeted by Mr. Jones who opened the door. Marshal Gunning informed Mr. Jones that he needed to vacate the premises. Marshal Gunning saw knives laying on the kitchen counter. He asked Mr. Jones if there were any drugs or weapons in the residence and Mr. Jones replied "no just those knives over there." The officers then allowed Mr. Jones to retrieve some of his personal belongings and he returned outside where he was handcuffed for officers' safety. Mr. Jones sat and remained at a picnic table located ten to twenty feet from the entrance to the residence, and two of the officers remained with him.

Sgt. Piergalski then asked Jennifer Kelley to sign a Consent to Search Form for her mobile home. [Exhibit #3]. Ms. Kelley agreed and signed the consent form. The Consent to Search Form permitted a warrantless search of her "trailer residence and all rooms including enclosed boxes, safes etc. . . ." Mr. Jones was not asked for his consent to search the trailer or the safe, nor was he shown the Consent to Search Form that Ms. Kelley had signed. Sgt. Piergalski then entered the residence to conduct the search, followed by Captain Jackson and Marshal Gunning. Once he entered the bedroom, Sgt. Piergalski saw two gun safes, a small one on top of a larger one, in the bedroom shared by Ms. Kelley and Mr. Jones. The officers also saw boxes of ammunition and empty gun holsters on the floor and on top of the safes. Sgt. Piergalski testified that the door to the smaller safe was partially open, and he could see several firearms inside the

safe. He then opened the door further to better see the firearms, which were handguns. Captain Jackson confirmed that the door to the smaller safe was open by a few inches when he and Sgt. Piergalski entered the room.

At that point, a deputy prosecutor arrived at the scene. In consultation with the prosecutor, the officers decided to seek a search warrant, so they ceased the search and stepped outside the residence while Marshal Gunning went to secure a warrant. A search warrant was issued shortly thereafter by the LaPorte County Superior Court to search the mobile home and the contents of the safe for evidence of sexual assault and of firearms. Officers then conducted a full search of the residence and, according to the government, seized thirteen firearms, over a thousand rounds of ammunition, seventeen clips, and several firearm scopes. Mr. Jones was subsequently indicted for possessing firearms having previously been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1).[1]

## II. STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 636(b)(1)(B), a magistrate judge may conduct an evidentiary hearing and submit proposed findings of fact and recommendations for the disposition of a motion to suppress. A party may then file an objection to the magistrate judge's proposed findings and recommendations. *Id.* § 636(b)(1)(C). Thereafter, "[a] judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.*

---

[1] Ms. Jones was separately charged and convicted in state court on one count of child molesting and two counts of sexual misconduct with a minor, for which he was sentenced to a total of 40 years of imprisonment.

## III. DISCUSSION

Mr. Jones seeks to suppress all of the evidence seized at his home, arguing that the evidence was seized as a result of an unlawful search without a warrant. The Fourth Amendment prohibits unreasonable searches and seizures and provides that a warrant may not issue without probable cause. U.S. Const. amend. IV. The Supreme Court has interpreted those provisions as meaning that police may not enter or search a home without a warrant except in certain circumstances. *Fernandez v. California*, 134 S. Ct. 1126, 1131–32 (2014); *Georgia v. Randolph*, 547 U.S. 103, 109 (2006). Where the government obtains evidence in a warrantless search, it bears the burden of proving by a preponderance of the evidence that an exception to the warrant requirement applies. *United States v. Basinski*, 226 F.3d 829, 833 (7th Cir. 2000). One common exception is that police need not obtain a warrant to search a home where an occupant of the home consents to the search. *Fernandez*, 134 S. Ct. at 1132 ("'Consent searches are part of the standard investigatory techniques of law enforcement agencies' and are 'a constitutionally permissible and wholly legitimate aspect of effective police activity.'" (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 228, 231–32 (1973)). Typically, the consent of any occupant with actual or apparent authority is sufficient to authorize a search; police need not seek out or inquire with any other co-occupants for their consent. *Id.* at 1129 ("Our cases firmly establish that police officers may search jointly occupied premises if one of the occupants consents.");

Here, Mr. Jones does not dispute, and the evidence is clear, that Ms. Kelley freely gave her consent for the officers to search their home and that she had the authority to do so, which would ordinarily suffice. However, the Supreme Court carved out a narrow exception to that rule in *Randolph*, holding that where a co-occupant is both present at the time of the search and objects to the search, that co-occupant's "express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant." 547 U.S. at 122–23. In

emphasizing that its holding was confined to situations where the co-occupant both was present and objected to the search, the Court explained: "if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out." 547 U.S. at 121. Mr. Jones acknowledges that he never actually objected to the search, so his argument does not fit into that framework, either. The Court also noted in *Randolph*, though, that its rule would apply "[s]o long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection . . . ." *Id.* Seizing upon this language, Mr. Jones insists that the officers removed him for the purpose of preventing him from objecting to the search, and that Ms. Kelley's consent was thus invalid as to him.

     Mr. Jones' argument fails first, though, because his factual premise is mistaken: he was not removed from the premises during the search. Mr. Jones voluntarily stepped outside when asked by the officers, after which he remained on the property and sat just feet from the front door throughout the search. He was not taken away from the property at that time or even placed in a squad car. He surely saw that officers were inside his home, and he had every opportunity to object, as he even conversed with the officers standing with him. Had he done so, his objection would have preempted Ms. Kelley's consent, as he would have been both present and objecting. *Randolph*, 547 U.S. at 121. He declined to object, but he was still present. Thus, this case does not raise the question from *Randolph* about when police remove an individual to prevent them from objecting—it instead presents the same circumstances as in *Matlock* and *Rodriguez*, which *Randolph* reaffirmed, where the defendants were present or nearby but were not asked and did not object. In short, Mr. Jones was precisely the "potential objector" described in *Randolph*,

5

who, "nearby but not invited to take part in the threshold colloquy, loses out." Accordingly, the Court finds that Ms. Kelley's consent was effective to permit the search because Mr. Jones was present but failed to object, so officers did not violate the Fourth Amendment by entering the home pursuant to that consent.[2]

In any event, what Mr. Jones refers to as the question left open in *Randolph* has already been answered by the Supreme Court:

> We first consider the argument that the presence of the objecting occupant is not necessary when the police are responsible for his absence. In *Randolph,* the Court suggested in dictum that consent by one occupant might not be sufficient if "there is evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection." 547 U.S., at 121, 126 S.Ct. 1515. We do not believe the statement should be read to suggest that improper motive may invalidate objectively justified removal. Hence, it does not govern here.
>
> The *Randolph* dictum is best understood not to require an inquiry into the subjective intent of officers who detain or arrest a potential objector but instead to refer to situations in which the removal of the potential objector is not objectively reasonable. . . . We therefore hold that an occupant who is absent due to a lawful detention or arrest stands in the same shoes as an occupant who is absent for any other reason.

*Fernandez v. California*, 134 S. Ct. 1126, 1134 (2014). Here, Mr. Jones argues at length that the subjective intent of the officers was to prevent him from objecting to a search, but *Fernandez* establishes that that is irrelevant as long as any detention or arrest is lawful. *Id.* Mr. Jones never directly addresses that question, and has provided no reason to believe that the officers unlawfully detained or arrested him. Mr. Jones voluntarily exited the residence at the request of the officers when they arrived. Since Ms. Kelley reported that there were weapons inside and that Mr. Jones might be violent, it was reasonable for officers to then handcuff Mr. Jones for their safety while they were at the home. *United States v. Parker*, 469 F.3d 1074, 1078 (7th Cir.

---

[2] As stated by the magistrate judge, "because Kelley voluntarily gave police officers consent to search the residence she shared with Jones and Jones did not object, *though present*, the consent to search was valid." [DE 31 p. 7 (emphasis added)].

6

2006) (holding that a co-occupant's consent was valid even though the defendant was absent because the police detained him upon arriving at the scene). And given the allegation that Mr. Jones had sexually assaulted a minor and Ms. Kelley's statements that Mr. Jones possessed weapons inside their home, which he was prohibited from doing based on his felony convictions (which the officers confirmed), officers had probable cause to arrest Mr. Jones, too. Accordingly, regardless of whether the officers subjectively wanted to circumvent any objection by Mr. Jones to a search, they did not unlawfully detain or remove him, so Ms. Kelley's consent was valid even as to Mr. Jones.

Mr. Jones next argues that even if Ms. Kelley's consent allowed officers to enter the home, she did not have the authority to authorize a search of the safe, and the firearms in the safe were not visible in plain view. Thus, he argues that the firearms found in the safe should be suppressed as the product of an unlawful search even if the initial entry into the home was proper. Like the magistrate judge, the Court need not address the question of the scope of Ms. Kelley's authority to consent to a search of the safes, as the Court finds that the officer observed the firearms in plain view inside the safe prior to opening it further. When officers observe an object in plain view from a location where they have a legal right to be, that observation does not constitute a search and thus does not require a warrant. *Horton v. California*, 496 U.S. 128, 133 (1990); *United States v. Brandon*, 593 F. App'x 553, 558 (7th Cir. 2014). Likewise, when officers observe contraband in plain view and its incriminating nature is immediately apparent, they are entitled to seize that contraband. *Horton*, 496 U.S. at 136–37; *United States v. Cellitti*, 387 F.3d 618, 623 (7th Cir. 2004) ("[A]n officer may . . . seize an incriminating item not within the scope of the consent [to search] if it is in 'plain view.'"); *United States v. Brown*, 79 F.3d 1499, 1508 (7th Cir. 1996). The incriminating nature of the object must be apparent without

7

needing to manipulate or further expose the object, though, unless the officers are otherwise entitled to take those actions. *Horton*, 496 U.S. at 136–37; *United States v. Schmidt*, 700 F.3d 934, 939 (7th Cir. 2012); *Brown*, 79 F.3d at 1508 ("[I]t is critical, if somewhat obvious, that a plain view seizure involve an identifiable object actually in plain view.").

Here, the government asserts that the safe was partially open and that the firearms were visible to Sgt. Piergalski inside the safe before he opened the door the rest of the way. Sgt. Piergalski was questioned on that topic at length during the hearing by the government, the defendant, and the magistrate judge, and his testimony was consistent that he could see the firearms inside the safe before he opened it further. During questioning by the magistrate judge, Sgt. Piergalski testified:

> Q: Also, you said when you went into the bedroom, you saw two safes?
>
> A: Yes, sir.
>
> Q: Were the safes closed?
>
> A: I believe the bottom one was. The top one, I believe, was partially open.
>
> Q: It was partially open, and you said you saw guns in the safe?
>
> A: Yes, sir.
>
> . . . .
>
> Q: So the door was ajar; you could look into the safe?
>
> A: Yes, sir.
>
> Q: And you did?
>
> A: Yes.
>
> Q: And you saw guns inside?
>
> A: Yes, sir.
>
> . . . .

> Q: The safe was open, you could see guns in the safe, you then opened the door further, and you could see them better?
>
> A: Yes, sir.
>
> Q: But you had already seen them in there before you had done anything?
>
> A: Yes, sir.

[DE 34 p. 78, 84–85]. Officer Piergalksi testified likewise on questioning by defense counsel:

> Q. Could you describe how that small safe appeared when you first got into the bedroom. You said it was open a little bit?
>
> A. Yeah. It was open enough to see into initially, yes.
>
> Q. And you peeked in there?
>
> A. That's correct.
>
> Q. Did you do that for officer safety purposes or for what?
>
> A. I looked into it to see what was in there, and I saw firearms.
>
> . . . .
>
> Q. So, to clarify, if you pulled the door open, then the door was closed when you first saw that small safe?
>
> A. The door was initially ajar. It was partially open.
>
> Q. Partially open?
>
> A. Yes.
>
> Q. You couldn't see in there?
>
> A. No, that's not correct. I told you before I could see in there.
>
> . . . .
>
> Q: So I guess that's my question: Apparently you didn't really see the handguns and ammunition until you opened the door further?
>
> A. No, sir, I saw it initially when the door was initially ajar on the top safe.
>
> Q. And how far ajar was it?

A. Just a few inches, enough to see in there and see the weapons and ammunition in there

[DE 34 p. 85, 105–06]. Moreover, Captain Jackson, who followed Sgt. Piergalski into the room, confirmed that the door to the safe was open "a few inches" or a "couple inches" and that it would have been possible to see inside it, though he did not look inside it himself until it was opened entirely. [DE 34 p. 96–97].

In arguing to the contrary, Mr. Jones relies entirely on a report Sgt. Piergalski wrote after the search, in which he stated, "There was a key in the top smaller safe and the safe was unlocked, so I pulled the door open for officer safety and immediately observed several handguns and much ammunition." [DE 34 p. 107]. However, to the extent there is an inconsistency between that statement and the testimony at the hearing, the Court finds the testimony at the hearing more probative and persuasive, as Sgt. Piergalski testified consistently in response to precise questions about the order of events, and Captain Jackson confirmed that the safe was ajar when they entered the room.[3] Accordingly, the Court finds that the firearms were visible in plain view inside the safe, so the officers did not conduct an unlawful search when they observed those firearms.

Finally, the Court notes that even if Mr. Jones was correct that officers unlawfully opened the safe prior to securing the search warrant, that would not necessarily result in the suppression of any evidence, much less all of the evidence. First, officers had already observed boxes of

---

[3] For what it's worth, neither party raised the applicability of the plain view exception prior to the hearing—the government's pre-hearing filing did not address the validity of any search of the safe at all, and argued only that Ms. Kelley's consent authorized the search in its entirety. Not until after the close of evidence did the magistrate judge ask counsel about the plain view doctrine, so Officer Piergalski and Captain Jackson likely had little reason to believe this testimony would be important such that they would have a motive to misstate the sequence. And if the officers were embellishing, they could have just said the safe was wide open when they entered the room, yet they both testified the door was open by a few inches.

ammunition and holsters in the bedroom, so that evidence would not be suppressed. Moreover, evidence discovered and seized after the safe was opened could still be admitted under the inevitable discovery exception to the exclusionary rule. Under that exception, evidence will not be excluded notwithstanding an unlawful search where the government proves (1) that it had an independent, legal justification for conducting a search that would have led to the discovery of the evidence; and (2) that it would have conducted a lawful search absent the challenged conduct. *Nix v. Williams*, 467 U.S. 431, 444 (1984); *United States v. Pelletier*, 700 F.3d 1109, 1116 (7th Cir. 2012). "In other words, the government must show not only that it *could* have obtained a warrant, but also that it *would* have obtained a warrant." *Id.*; *see also United States v. Brown*, 64 F.3d 1083, 1085 (7th Cir. 1995) ("What makes a discovery 'inevitable' is not probable cause alone . . . , but probable cause plus a chain of events that would have led to a warrant (or another justification) independent of the search."). As to the second factor, the government "need only show that 'it would be unreasonable to conclude that, after discovering all of the information, the officers would have failed to seek a warrant.'" *Pelletier*, 700 F.3d at 1117 (quoting *United States v. Marrocco*, 578 F.3d 627, 640 (7th Cir. 2009)).

     Here, as to the first element, there is no question that the officers had probable cause for a search warrant even prior to their initial entry—Mr. Jones expressly conceded as much in his post-hearing brief. [DE 26 p. 2 ("After Jennifer Kelley and her daughter told Marshal Gunning and Deputy Yagelski about the sex crimes and that the defendant was a convicted felon in possession of guns, the police had sufficient probable cause to obtain a search warrant.")]. There is likewise little question that the officers would have still sought the warrant even if they had not seen the firearms inside the safe during their initial entry. Officers were investigating a reported sexual assault of a minor by Mr. Jones; Ms. Kelley was fearful for her and her

daughters' safety and reported that Mr. Jones kept firearms inside their home and could be dangerous; officers confirmed that Mr. Jones had a criminal record and could not lawfully possess a firearm; and prior to seeing inside the first safe, officers observed boxes of ammunition and empty holsters in the bedroom, which further corroborated Ms. Kelley's statement and indicated that firearms were likely nearby. The gun safes the officers observed in the room would be a natural location for those firearms. It is implausible to think that under these circumstances, the officers would not have sought the search warrant had they not seen inside the first safe.

And of course, the officers *did* seek and receive a search warrant that authorized them to search the premises, including the safes.[4] Thus, even if the Court found that it was improper for the officers to have opened the first safe initially, that improper search would not have tainted the evidence subsequently seized pursuant to the warrant (including the evidence seized from the open safe) such that exclusion of that evidence from trial would be justified. Accordingly, Mr. Jones' motion to suppress is denied for that reason, too.

## IV. CONCLUSION

For those reasons, the Court OVERRULES Mr. Jones' objections [DE 32] to the Magistrate's Report and Recommendation; ADOPTS the Report and Recommendation [DE 31]; and DENIES the motion to suppress [DE 12].

---

[4] The closely related independent source doctrine would thus apply equally under these circumstances, as the evidence was seized pursuant to a warrant for which probable cause existed prior to any potentially unlawful search, and the officers would have sought that warrant even if they had not seen the contraband inside the first safe. *See Murray v. United States*, 487 U.S. 533, 541–43 (1988).

SO ORDERED.

ENTERED: January 27, 2016

                                          /s/ JON E. DEGUILIO
                                Judge
                                United States District Court